**SHEAR CO. v. SMITH et al.**    (No. 8723.)

(Court of Civil Appeals of Texas. Dallas.
March 31, 1923. Rehearing Denied
May 5, 1923.)

**1. Appeal and error �köÆ204(3) — Contents of
written contract proved by parol regarded as
properly proved where no objection was made.**

Where no objection appears to have been
made to parol evidence as to a contract and its
contents, the facts are to be regarded on appeal
as properly proved.

**2. Mortgages �köÆ38(1)—Testimony of notary
and grantor held sufficient to show that gran-
tor was induced to sign deed by representa-
tions that instrument was a mortgage.**

In an action by a husband and a wife to re-
cover land conveyed to defendant, the testimony
of the notary who took the wife's acknowledg-
ment to instrument in the form of an absolute
deed to her homestead and the testimony of the
wife herself *held* sufficient to prove that the
wife was induced to sign the instrument by
fraudulent representations of the notary, made
under the instructions of the grantee, that the
instrument was in fact a mortgage.

**3. Homestead ⊃köÆ115(2)—Wife's deed to home-
stead procured by fraudulent representations
under instructions from grantee that instru-
ment was a mortgage held void.**

An instrument in the form of an absolute
deed to a homestead, signed by the wife, upon
fraudulent representations of the notary, under
instructions from grantee, that the instrument
was a mortgage to secure husband's indebted-
ness to grantee, *held* void as being only a
mortgage.

**4. Homestead ⊃köÆ133 — Wife cannot defeat
homestead conveyance by proof that she was
misled by notary as to character of instru-
ment without proof that grantee participated
in fraud.**

A wife cannot defeat and have annulled a
homestead conveyance by mere proof that at
the time of her acknowledgment, evidenced by a
certificate in due and regular form, she did not
understand the import of the instrument, and
that it was not properly explained to her by
the notary, unless she also establishes either
that the notary was instructed or inspired by
the grantee or that the grantee had knowledge
of the misrepresentations or improper conduct
in obtaining the acknowledgment.

**5. Principal and agent ⊃köÆ131—Grantee bound
by fraud practiced in his behalf by notary
though he did not hear his instructions car-
ried out by notary.**

A grantee cannot escape the effect of a
fraud practiced in his behalf by the notary, or
of a representation induced by him on the
ground that he did not hear his instructions
carried out or was not informed by the notary
or otherwise, after the act, that the execution
of the deed was obtained as the result of the
instructions given.

**6. Appeal and error ⊃köÆ882(14) — Appellant
cannot complain of submission of special is-
sues requested by him.**

An appellant cannot complain on appeal of
the submission of special issues requested by
him.

Appeal from District Court, Ellis County;
W. L. Harding, Judge.

Action by the Shear Company against P.
P. Smith and others. Judgment for defend-
ants, and plaintiff appeals. Affirmed.

G. C. Groce, of Waxahachie, and J. D.
Williamson, of Waco, for appellant.

Farrar & Kemble, of Waxahachie, for ap-
pellees.

HAMILTON, J. On a former day of this
term of court the judgment of the trial court
was reversed, and judgment was rendered for
appellant. The cause is now before us upon
a motion for rehearing. The motion will be
granted, and the judgment and opinion of
the court heretofore rendered will be with-
drawn and set aside.

This is a suit in the nature of trespass to
try title brought by appellant against appel-
lees for the recovery of certain described resi-
dential property situated in the city of Waxa-
hachie, Ellis county, Tex. The issues were
joined by a plea of not guilty in response
to the petition and by specific allegations
that appellees owned in fee simple the prem-
ises described in the petition, and that they
were then, and had been for many years,
occupied and used as a homestead by appel-
lees. They alleged that on or about the 17th
day of July, 1915, they executed an instru-
ment to appellant in the form of an absolute
conveyance, but which was intended only as
a mortgage to secure certain indebtedness
pre-existing and to accrue. They alleged
this instrument to have been intended not as
an absolute conveyance, but only as a mort-
gage or deed of trust. They pleaded that
appellant was estopped to deny the invalidity
of this instrument as a deed of conveyance
for the reason that the notary public who
took the acknowledgment of appellee, Mrs.
Nannie L. Smith, wife of appellee P. P. Smith,
did so as the agent of appellant, and at its
request and under its instruction; that said
notary, in the capacity of appellant's agent
and representative, represented the instru-
ment to Mrs. Nannie L. Smith to be, in ef-
fect and in substance, only a mortgage or
deed of trust, and not an absolute convey-
ance of her homestead, and that such repre-
sentations made to her by the notary public,
acting under the instructions of appellant, in-
duced her to sign the instrument for the
purpose only of giving the mortgage to secure
debts due and to become due appellant.

Appellees alleged the claim of appellant
and the deed executed as a mortgage to it

by appellees on July 17, 1915, to constitute a cloud upon their fee-simple title, and sought as affirmative relief a judgment canceling the deed alleged by them, as above stated, to be void. In answer to appellees' pleadings, appellant, by supplemental petition, excepted to various allegations made by appellees, and denied them all.

Appellant was a corporation engaged in the wholesale grocery business. It had conducted such business many years under the name of Rotan Grocery Company, and, at the time of the transaction out of which this litigation arises, it was operating under that name, but, at a subsequent date, by amendment of its charter, the name was changed to that of the Shear Company, under which name this suit was instituted.

[1] Appellee P. P. Smith was engaged in the retail grocery business in Waxahachie on July 17, 1915, and had been engaged in this business in that city continuously for many years immediately preceding that date. Some time before July 17, 1915, his business affairs had fallen into a precarious condition, and he owed appellant several thousand dollars. According to the testimony, numerous interviews were had between Smith and appellant's agents in the pursuit of an effort to adjust his past-due indebtedness to appellant. The pursuit of the effort finally culminated in the execution by P. P. Smith and his wife, on July 17, 1915, of a conveyance in the form of an absolute warranty deed which was delivered to appellant and put on record in the deed records of Ellis county. It was testified that at the time Smith signed the deed he also signed a rental contract, agreeing to pay $15 per month rent for the premises. He never paid any rent after signing the deed and this instrument, although the suit involved in this appeal was not filed until February 19, 1919, nearly four years after the execution of the deed and the signing of the agreement to pay rent. Smith's testimony on this point is more or less confusing, and the effect of it might be said to constitute neither an admission nor a denial that he signed such an instrument. Our attention is called to no other proof of the existence at any time of a rental contract. There appears to have been no objection made to the parol evidence given in behalf of appellant to prove the contract and its contents, and, accordingly, the facts are to be regarded as properly proved.

The evidence was sufficient to establish the conclusion that P. P. Smith, himself, and appellant's agents representing it in the transaction mutually intended that the instrument should constitute an absolute deed of conveyance, and not a mortgage for the security of indebtedness, and the jury found such to be the fact.

Mrs. Nannie L. Smith's intention and purpose in executing the deed and the representations made to her to induce her to execute it appear exclusively and without contradiction or any equivocation in her testimony and that of the notary public, Thos. N. Herring, who took the acknowledgments to the deed.

Mrs. Smith testified as follows:

"I remember to have signed that deed on that date. When I signed the deed I was at home, out on the back porch, when Tom came. It was in the forenoon, but I would not say just what hour it was, because I cannot recollect, but it was in the forenoon, I suppose somewhere between 10 and 11 o'clock. I did not read the deed. I am not versed in law; I certainly am not. I have never read that deed.

"Q. What did he (Thos. N. Herring) tell you, Mrs. Smith? A. Well, he says, 'Here is the deed I brought up here to show you, and it is a deed of trust, and to secure Rotan, and secure us, so that we may be able—that Daddy might be able to go on in business, and it won't involve your home; you won't have to give up the home; they agreed to just make a deed of trust to us, and won't have to give up our home, if you sign this deed.'

"Q. Did he, or not, say anything about $3,-500 or anything of that kind? Was there anything said about that by Mr. Herring to you? A. He did not. After Mr. Herring had made his explanation as I have detailed, about the deed, I signed the deed.

"Q. What was it that induced you then to sign the instrument? A. Well, it was just faith; it was just trusting that we might be able to go on and fulfill—do what we could do to help Daddy to stay in business, so we might be able to pay Mr.—might be able to come back, in other words, and I felt like, well, if in the judgment of the others and Daddy, it must be mine; it was my interest as well as his; and I must sign that deed, because it must be right, or they would not have tried—we were trying to fix it right, trying to do what was right by everybody.

"Q. I will ask you this further question, Mrs. Smith: You have testified that Mr. Herring made certain explanations concerning the deed; I will ask you whether or not those explanations made by him to you had any effect in inducing you to sign the deed? A. Well, of course, him telling me what it was—it did have, of course, I could not—

"Q. What was it you started to say, Mrs. Smith? A. What he told me is why I did it.

"Q. You say you remember that you signed that deed in the forenoon between 10 and 11 o'clock? A. I don't remember just exactly what hour it was, but it was in the forenoon, it seems—I am sure. I feel like I want to say that it was in the forenoon, because that is what I think. It has been a good long while, you know. When you go to try to tax the memory that many years, it is a good deal to do for anybody my age. My best recollection is that it was in the forenoon. Mr. Herring brought the deed up to me. Mr. Smith did not come with Mr. Herring. Mr. Smith was in town that day. I don't know whether Mr. Smith had been down to Waco that morning or not. I can't remember that. When Mr. Herring came to the house I looked at the deed. I knew it was a deed, of course; I knew that much about it, that it was a deed. Of course I

knew it was a deed that I was signing. That house up there was the same property that Mr. Smith had bought from Mrs. Gammon on the 13th of June, 1913. He had bought it just about two years before July of 1915. Before we bought that house we had not been renting it. We did not have a home before we bought this house. We had no home up to June, 1913—not over here; just a few years we had not had a home, and we had been renting for a few years, and in June, 1913, Mr. Smith and I bought this house from Mrs. Gammon. I did not know a thing about any promise Mr. Smith may have made to pay rent on this house."

Thos. N. Herring, the notary public, testified in part as follows:

"About the 15th of July, or in July of 1915, I was still in the employment of Mr. Smith as his bookkeeper, and Mr. Smith was not physically able to attend to much business, and he was about the store only a part of the time. At that date Mr. Smith lived at his residence, which residence is the same he now lives in; the same house. Mr. Smith was a married man, and Nannie L. Smith was his wife, and Mr. P. P. Smith and Nannie L. Smith, his wife, occupied that residence as a homestead at that time, and they had no other homestead and had no other real property whatever. It appears in evidence that there is a deed, absolute in form, made by P. P. Smith and his wife, Nannie L. Smith, on the 17th day of July, 1915, to this property I have mentioned, and I know how Mr. Smith came to make that deed, and what led up to the making of the deed. In getting this deed executed the Rotan Grocery Company was represented, and was represented by W. N. Orand, who is sitting with counsel for plaintiff now. I understand that W. N. Orand is credit man for Rotan Grocery Company, or was at that time. Mr. Orand had been in Waxahachie two or three times, I think, prior to the date of the execution of this deed in question, and he urged the execution of this deed in order to secure the account, and I think there were three trips made before there was an agreement made between Mr. and Mrs. Smith, and through me, with Mr. Orand, to sign the deed, with the distinct understanding that it was to secure the account. The words that passed with Mr. Orand were that it was to show good faith, for Mr. Smith to show good faith, and so that he could continue in business. 'If you will sign this deed, and your wife, when you pay the account we will deed the place back to you;' that is the very words he used. I will further state in that connection that Mrs. Smith was not present at that time, and when the statements were made with reference to the purpose of this deed by Mr. Orand no one was present except myself and Mr. Smith and Mr. Orand. I did not write that deed. I saw the deed for the first time when Mr. Orand showed it to me in the store. When Mr. Orand made the statements I have just testified about we were in the store over here by the telephone office. At that time I was a notary public, and I took the acknowledgment of Mr. Smith to the deed; Mrs. Smith was not present at that time. After Mr. Smith had signed this deed Mr. Orand made a request of me; he asked me to take the deed up to Mrs. Smith, and get her to sign it as a notary, because I was a notary, and I had taken Mr. Smith's acknowledgment. Mr. Orand told me what to tell Mrs. Smith; he told me to tell her exactly what he had told Mr. Smith, that it was to show good faith, and to secure the account, and when the account was paid that the property would be deeded back; and I went to Mrs. Smith, and explained to her what was said, and she signed it. I saw Mrs. Smith at her house, and I think we were on the back porch when I explained it; Mrs. Smith did not read the instrument. When I had explained the purpose of the instrument she said, as well as I remember, 'If it will help I am willing to sign it, if it will help Daddy stay in business.' I think that is the remark she made. I do not think of any thing else that Mrs. Smith said. I do remember a statement that Mrs. Smith made, something to the effect, after she had said what she said, that the home was all they had, and she was not going to give that up. * * * Mr. Orand came to Waxahachie in the month of July, 1915, and had this deed with him; he brought it in the store.

"Q. The first time you ever saw this deed, Mr. Orand brought a deed from P. P. Smith and his wife in the store, which was unsigned, and did he present it to you or to Mr. Smith? A. I think he presented it to me first; I don't know who he presented it to first, either Mr. Smith or me; I disremember that.

"Q. Did Mr. Smith sign it then? A. I am not positive whether he signed it the first time he (Mr. Orand) brought it around; I believe that he did; but he had talked to him about it at least three or four times before, and whether he had the deed then or not I do not know.

"Q. Do you mean on the same day? A. No, sir; at different times before that.

"Q. How many times before that? A. Twice, at least. * * *

"Q. Was that the same year? A. Within two weeks of the time that he really signed it.

"Q. Within two weeks? A. I think so.

"Q. Mr. Orand had talked to him about executing a deed to his home? A. Yes, sir. I was a notary public. I think I had been a notary for two years or four years; I really do not know how long. I knew a deed when I saw one. This was a deed. I did not read it over, though I saw from the instrument that it was a deed.

"Q. Isn't it a fact that you got credit on the Smith account with the Rotan Grocery Company for $3,500? A. No, sir; not that I know of. It was not the understanding that there was to be any credit.

"Q. Isn't it a fact that you got credit on the account, and that you kept up with the account, you, yourself, and there was a credit memorandum of $3,500 on the account? A. I do not remember any such transaction.

"Q. You kept up with every detail of that account, did you not? A. Yes, sir.

"Q. Down to the amount that was charged for revenue stamps, did you not? A. I don't think so. I don't know that I watched that—

"Q. You watched the account pretty carefully, did you not? A. Yes, sir.

"Q. Is it not a fact that after this deed was executed that you did receive a statement and the account was credited with $3,500 of date July 22, 1915? A. I never did see it.

"Q. Did you get a statement every month? A. Yes, sir.

"Q. Did that not show the state of the account? A. I never saw it. The entire papers and everything was turned over that I had on hand. I say at the time I saw this instrument I knew that it was a deed. Mrs. Smith was my mother-in-law. .

"Q. And you say she told you that—she said, 'If it will help Daddy stay in business I will sign it?' A. 'But I won't sign it to take our home away from us;' that is what she added. I remember that.

"Q. You remember that now, that she won't sign it if it will take her home away from her? A. 'If it will take our home away from us.'

"Q. You explained to her that it was a deed? A. No; I did not explain it to her at all, only what Mr. Orand had told me to tell her.

"Q. You were a notary? A. Yes, sir.

"Q. You made the certificate on here? A. Yes, sir.

"Q. Your certificate: 'Before me personally appeared Nannie L. Smith, wife of said P. P. Smith, known to me to be the person whose name is subscribed to the foregoing instrument, and having been examined by me privily and apart from her husband, and having had the same fully explained to her by me, she, the said Nannie L. Smith, acknowledged such instrument to be her act and deed and declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.' You made that certificate? A. Yes; and I also made the statement to Mrs. Smith, according to Mr. Orand's instructions, what I have already introduced, or said.

"Q. She was your mother-in-law, and you knew she was signing a deed, and you were taking her acknowledgment to a deed; you knew that, did you not, Mr. Herring? A. Yes, sir.

"Q. Did you not tell you mother-in-law that she was signing a deed? A. Yes, sir; but I told her what she was signing it for.

"Q. You told her what she was signing it for? A. Under the instructions of Mr. Orand.

"Q. But you explained to her that she was signing a deed; she signed it willingly, did she not? A. Not very willingly; no sir.

"Q. Now, Mr. Herring, where was Mr. Orand at that time? A. When I went up to the house?

"Q. Yes. A. I believe he was still in town; I am not positive exactly where he was.

"Q. You do not know whether he was in town or not? A. If I remember correctly, he waited, and I brought it back and gave it to him; I don't remember that exactly.

"I do not know how the deed got to Waco. I am not positive that I brought the deed back and delivered it to Mr. Orand. At the time the deed was executed I do not believe I had the revenue stamps put on it. I do not remember who put the revenue stamps on the deed. I knew, certainly, that there had to be revenue stamps on the deed. I do not know when they were put on or who put the stamps on the deed. I don't remember whether I was there when the instrument was delivered to Mr. Orand. Mr. Smith was in the store when he signed this instrument. He was in the store, as well as I remember; I am not positive that he was in the store. I do not think I heard Mr. Smith tell Mr. Orand to prepare this deed, and that he would execute it. Mr. Orand had talked to Mr. Smith two or three times about executing the deed, and I do not think Mr. Smith had agreed to execute it. The day the deed was executed Mr. Orand came in and brought a deed out of his pocket, as well as I remember, or from somewhere about his person; as well as I remember that is the way it happened."

The agents of the appellant testified that they gave the notary public no instructions to make any representations to Mrs. Smith, and that, if he made such representations to her as disclosed by her testimony and that of the notary, they were made without the knowledge or consent of appellant or any of its representatives. A clear conflict of evidence as to the facts with reference to this feature of the case was thus clearly presented.

The case was submitted to the jury upon special issues. The questions submitted and the respective answers thereto were as follows:

"At the time the defendant P. P. Smith executed the instrument purporting to be a deed from himself and wife to the Rotan Grocery Company, in evidence before you, was it the intention of both P. P. Smith and the agent or agents of plaintiff, W. N. Orand or H. H. Shear, that the said instrument should constitute a mortgage for security of debt, and not an absolute conveyance? You will answer this question 'Yes' or 'No.' Answer: No.

"At the time the defendant Mrs. N. L. Smith executed the instrument mentioned in question No. 1, did she intend and believe the same to be an absolute conveyance of the premises described therein to the plaintiff? Answer 'Yes' or 'No.' Answer: No.

"At the time the defendant Mrs. N. L. Smith executed the instrument mentioned in question No. 1, did she intend and believe the same to be a mortgage or deed of trust to secure a debt of her husband, P. P. Smith? Answer 'Yes' or 'No.' Answer: Yes.

"At the time the defendant Mrs. N. L. Smith executed the instrument mentioned in question No. 1, did Thos. N. Herring, the notary public who took her acknowledgment, represent to her that said instrument was a mortgage or deed of trust for the securing of the account of her husband, P. P. Smith, with the plaintiff? Answer 'Yes' or 'No.' Answer: Yes.

"At the time Mrs. N. L. Smith executed the instrument mentioned in question No. 1, did Thos. N. Herring, the notary public who took her acknowledgment thereto, represent to her that said instrument was an absolute conveyance of the premises described in said instrument from herself and husband to the plaintiff? Answer 'Yes' or 'No.' Answer: No.

"At the time the notary public, Thos. N. Herring, took the acknowledgment of Mrs. Nannie L. Smith to the purported deed signed by her, and gave her such explanation thereof as he did give, if any, was he acting as such notary and giving such explanation, if he gave any, at

the instance and direction of W. N. Orand? Answer 'Yes' or 'No.' Answer: Yes.

"At the time the purported deed signed by Mrs. Nannie L. Smith was delivered to plaintiff, did W. N. Orand have knowledge that the same had been explained to her by the notary, as being a mortgage and not an absolute sale of the property therein described? Answer 'Yes' or 'No.' Answer: No. * * *

"Was Thos. N. Herring requested by W. N. Orand to obtain the signature of Mrs. Nannie L. Smith to the deed in evidence? Answer 'Yes' or 'No.' Answer: Yes.

"The burden is in the defendants to establish the affirmative of above issue by a preponderance of the evidence, and unless they have done so you will answer the issue 'No.'

Was Thos. N. Herring directed or instructed by W. N. Orand to obtain the acknowledgment of Mrs. Nannie L. Smith to the deed in evidence, and to represent to her that the deed she was signing was not a deed, but was intended as a mortgage as security for P. P. Smith's debt to plaintiff? Answer 'Yes' or 'No.' Answer: Yes.

"The burden is with defendants to establish the affirmative of this issue by a preponderance of the evidence, and unless they have done so you will answer this issue 'No.'"

The two special issues last copied above, together with the instructions relating to them, were specially requested by and given at the instance of appellant. Each and all of the issues above copied we think were clearly raised by the evidence, and the respective answers thereto are supported by substantial evidence.

The various propositions upon which the appeal is presented may be stated to the following effect: (1) That a notary public cannot impeach the veracity of his own certificate of acknowledgment made in due form; (2) that a wife cannot defeat a homestead conveyance by proof that at the time of her acknowledgment she did not understand the import of the instrument, and that it was not properly explained to her by the officer who took the acknowledgment, unless she also establishes that these facts were brought home to the knowledge of the grantee; (3) that, although parol evidence may be received to prove that a deed absolute in form was intended as a mortgage, yet this is only when there is proof that the intention of both the vendor and the vendee was that the instrument should be a mortgage; (4) it is also contended that the deed could not be held as a mortgage because the proof showed it to be absolute on its face, and that it was accepted in payment of an existing debt; (5) it is urged that the judgment rendered by the court upon the findings of the jury was improper, for the reasons that the jury found in response to special issue No. 1 that it was not the intention of the parties that the instrument should be a mortgage, and because the jury found in response to special issue No. 7 that the appellant had no knowledge that the deed was explained to Mrs. Smith as being a mortgage, and, appellant, being a purchaser for value, and having no knowledge of any infirmity in the instrument, acquired by virtue of it an absolute title to the property.

[2-5] While it is consistently held that only clear, cogent, and certain proof is sufficient to sustain the impeachment of a deed or of the notary's certificate of acknowledgment thereto, yet it is equally well established and uniformly held that, under allegations and proof that an instrument which appears to be a deed to a homestead, absolute upon its face, was obtained by fraudulent representations participated in by or made with the knowledge of the grantee, or under his instructions, it may be impeached and nullified as being only a mortgage, and accordingly void. We know of no authority which holds that a judgment may not be predicated solely upon the testimony of the notary whose certificate the instrument bears, and that of the wife whose separate acknowledgment he takes, when the testimony upon which the verdict and judgment are rested is of that potency and certainty by which the above-copied testimony of Herring and Mrs. Smith is characterized. Ordinarily no other proof of representations and explanations made to a married woman by a notary public in taking an acknowledgment except the testimony of those two persons is available. To deny the efficacy of such testimony in cases of this character in effect would be to foreclose the right of a married woman, to assail a deed obtained through fraud and misrepresentation participated in by the notary and the grantee. It is true that a wife cannot defeat a homestead conveyance by mere proof that at the time of her acknowledgment, which is evidenced by a certificate in due and regular form, she did not understand the import of the instrument, and that it was not properly explained to her by the officer who took the acknowledgment, unless she also establishes either that the notary was instructed or inspired by the grantee, or that the grantee had knowledge of the misrepresentations and improper conduct of the notary in obtaining the acknowledgment. But, if the grantee instructs the notary to make the misrepresentations, and the notary carries out the instructions and obtains the deed, then knowledge of the actual making of the misrepresentations will be imputed to the grantee, regardless of whether or not he knew they actually were made in accordance with instructions given the notary, and regardless of whether or not the grantee was informed at the time of the delivery of the deed that the representations had actually been made. A grantee cannot escape the effect of a fraud practiced in his behalf or of a representation induced by him on the ground that he did not hear his instructions carried out, or was not informed by the notary or otherwise, after the act, that the

execution of the deed was obtained as the result of the instructions given. His design having been executed under his instructions, the deed is void as between him and the grantor.

We do not agree with the contention that the instrument cannot be held to be a mortgage on the ground that, even if Mrs. Smith did intend it only as a mortgage, appellant did not, and, accordingly, that such intention appears not to have been mutual between her and appellant, and that the instrument must be held to be a deed because it is such in form and was so intended by appellant. Regardless of the fact that appellant intended it to be a deed, the finding of the jury, supported by the above-quoted positive evidence of the notary, in effect was that appellant contrived to obtain the deed, and did obtain it, by representing to Mrs. Smith through the notary that it was intended only as a mortgage. A deed obtained by deceit, participated in by the vendee or practiced under its instructions or with its knowledge in obtaining the instrument, cannot be upheld on the ground that the instrument expresses the intention of the grantee and that the intention of the grantor alone under such circumstances is insufficient to constitute the instrument a mere mortgage.

There was proof that when the deed was delivered appellant gave P. P. Smith credit for $3,500 on the indebtedness due appellant by him. There was also positive proof on behalf of appellant that the consideration for the execution and delivery of the deed was to be a credit in this amount upon appellee Smith's indebtedness. This evidence is contradicted on behalf of appellees. However, regardless of what the understanding between appellant and P. P. Smith may have been, that understanding cannot render the instrument a deed if, as the jury found, Mrs. Smith was induced by Herring's representations, made to her at appellant's behest, to believe that it was to be a mortgage, and not a deed, when she signed it. Her homestead right and title rested in her in conjunction with Smith. It did not depend to any extent upon his independent volition or intention. He alone could alienate no part of the property by any character of sale. This could be done only as the joint act expressing the joint intention and agreement of both. Her intention, not his, determined the validity and effect of her execution and acknowledgment of the instrument in the light of the evidence bearing upon the alleged representations to her. Of course, she could not be heard to say that she did not intend the instrument to be a deed in the absence of proof not only that the notary explained it to her as not being a deed, and thereby misled and deceived her as to its nature and purpose, but also that appellant participated in these acts by instructing and directing the notary to do them. The proof is adequate for this purpose, and the jury has found and declared its sufficiency.

The evidence supports the jury's finding that at the time P. P. Smith executed the instrument there was a mutual intention between him and appellant that it should constitute an absolute conveyance. The evidence also supports the jury's other findings, to wit, that Mrs. Smith did not believe the instrument to be an absolute conveyance, but believed it to be only a mortgage; that the notary represented to her that it was a mortgage to secure her husband's' account, and not an absolute conveyance; that, in making such representations and explanations of the instrument, he acted at the instance and under the direction of appellant's agent; that, at the time the purported deed was delivered to appellant, Orand did not have actual knowledge that it had been represented to Mrs. Smith as being a mortgage, and not an absolute conveyance of the property; that Herring was requested, directed, and instructed by Orand, appellant's agent, to obtain Mrs. Smith's signature to the deed and take her acknowledgment, representing to her that the deed was intended only as a mortgage to secure P. P. Smith's indebtedness to appellant. All these findings are supported by sufficient testimony to sustain them, and there is no contradiction or insufficiency in them.

[6] The last two special issues hereinabove set out were, as before stated, specially requested by appellant. By requesting them appellant put itself in the position of vouching to the court that such issues were proper to be submitted to the jury, and that they were material controverted issues of fact. Accordingly, appellant in these circumstances cannot now be heard to complain that the evidence was insufficient to sustain the respective answers to them rendered by the jury. When a party requests and obtains an issue to be submitted to the jury, he thereby precludes himself of the right on appeal to have reviewed the action of the trial court in granting his request if the finding of the jury is adverse. In this connection it is to be observed that appellant did not request a peremptory instruction, but, if it had requested such instruction, we think it obvious that under the state of the evidence it should have been refused.

Believing that the cause was properly submitted to the jury, and that the evidence was sufficient to sustain all the findings reflected by the verdict and expressed by the judgment of the trial court, we will affirm that judgment.

Affirmed.